1  **WEXLER WALLACE LLP**
   Mark J. Tamblyn (State Bar No. 179272)
2  Email: mjt@wexlerwallace.com
   Neha Duggal (State Bar No. 251336)
3  Email: nd@wexlerwallace.com
   455 Capitol Mall, Suite 231
4  Sacramento, California 95814
   Telephone: (916) 492-1100
5  Facsimile: (916) 492-1124

6  **SQUITIERI & FEARON, LLP**
   Lee Squitieri
7  Email: lee@sfclasslaw.com
   Garry Stevens
8  Email: garry@sfclasslaw.com
   32 East 57th Street, 12th Floor
9  New York, New York 10022
   Telephone: (212) 421-6492
10 Facsimile:  (212) 421-6553

11 *Attorneys for the Plaintiff*

FILED

2009 SEP 11  PM 3: 82

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

12

13

14  **UNITED STATES DISTRICT COURT**

15  **SOUTHERN DISTRICT OF CALIFORNIA**

16  DAVID GIAMBUSSO, individually and on
    behalf of all others similarly situated,
17
                                               Case No. '09 CV 2002 LAB    JMA
18              Plaintiff,

19        v.                                   **CLASS ACTION COMPLAINT**

20
    NATIONAL ASSOCIATION OF MUSIC
21  MERCHANTS, INC.; GUITAR CENTER,
    INC.; and FENDER MUSICAL
22  INSTRUMENTS CORP.,

23              Defendants.                    **DEMAND FOR JURY TRIAL**

24

25

26                                             BY FAX

27

28

CLASS ACTION COMPLAINT

1        Plaintiff, David Giambusso, for his Class Action Complaint against Defendants, upon

2  personal knowledge as to facts pertaining to himself and upon information and belief as to all

3  other matters, states as follows:

4                             **NATURE OF ACTION**

5        1.      Plaintiff, a consumer and a direct purchaser of a guitar from one of the defendants

6  herein, brings this action on his own behalf and on behalf of a class of purchasers of fretted

7  musical instrument products such as acoustic and electric guitars, violins, amplifiers and strings

8  ("Fretted Instrument Products") between January 1, 2005 and December 31, 2007.

9        2.      In March 2009, the Federal Trade Commission ("FTC") issued a cease and desist

10  order to the National Association of Music Merchandising ("NAMM") and at the same time

11  settled the FTC's charges that NAMM had "permitted and encouraged" acts constituting

12  violations of Section 5 of the FTC Act among its members and that the acts and practices of

13  NAMM "constitute unfair methods of competition in or affecting commerce in violation of

14  Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. § 45." The FTC also

15  alleged that absent appropriate relief "such acts and practices, or the effects thereof will continue

16  or recur . . ."

17        3.      Specifically, the FTC, after an investigation, alleged that between 2005 and 2007,

18  NAMM organized various meetings and programs for its members, such as defendants herein, at

19  which competing retailers of musical instruments were permitted and encouraged to exchange

20  competitively sensitive information, strategies for implementing minimum advertised pricing and

21  restrictions of retail price competition.

22        4.      The FTC alleged that the "challenged conduct served no legitimate business

23  purpose and resulted in no significant efficiency benefits."

24        5.      According to the FTC's press release announcing NAMM's settlement of "FTC

25  Charges of Illegally Restraining Competitions" "the FTC's proposed consent order is designed to

26  remedy NAMM's anticompetitive conduct." The Commission's vote to accept the complaint and

27  the consent order was 4-0.

28        6.      In the competition-restrained market created by defendants' conduct, plaintiff and

1    the Class purchased Fretted Instrument Products at artificially inflated prices.

2          7.      NAMM's conduct and that of other defendants named herein, all of whom are

3    members of NAMM, are *pre se* illegal under Section 1 of the Sherman Act. The conduct of

4    defendants, and each of them, unreasonably restrained trade in the relevant market(s) (defined

5    below), causing substantial anti-competitive effects and inflated prices to consumers.

6          8.      The conduct and scheme was specifically intended to protect NAMM members

7    from price competition by either securing higher price levels, and thereby restricting retail price

8    competition, or by eliminating price discounting entirely.

9          9.      Absent defendants' anti-competitive conduct, plaintiff and the other Class

10    members would have paid lower prices for the Fretted Instrument Products they purchased

11    during the Class Period. Plaintiff seeks damages and equitable relief under Sections 1 and 2 of

12    the Sherman Antitrust Act.

13                         **JURISDICTION AND VENUE**

14          10.     The Court has jurisdiction over the claims relating to violations of the Sherman

15    Antitrust Act of 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15. Jurisdiction is also proper

16    under 28 U.S.C. § 1332(d)(2).

17          11.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. §

18    1391. Several defendants transact business within this district; many of the acts and events

19    giving rise to this action occurred within this district; and defendant NAMM is headquartered in

20    this district.

21                             **PARTIES**

22          12.     Plaintiff David Giambusso is a resident of Brooklyn, New York. In or about

23    September 2007, Plaintiff purchased a guitar from Guitar Center.

24          13.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New

25    York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad,

26    California 92008.

27          14.     NAMM is a trade association comprised of more than 9,000 members, including

28    defendants, that include manufacturers, distributors, and dealers of musical instruments and

1    related products.  Most United States manufacturers, distributors, and dealers of musical

2    instruments are members of NAMM.  NAMM is controlled by its members, including

3    defendants herein.

4         15.    Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its

5    principal place of business at 5795 Lindero Canyon Road, Westlake Village, California and is a

6    retail seller of Fretted Instrument Products.  Guitar Center is a member of NAMM.

7         16.    Fender Music Instruments Corporation ("Fender") maintains its principal place of

8    business at 8860 East Chaparral Road, Suite 100, Scottsdale, Arizona.  Fender manufactures and

9    sells Fretted Instrument Products, and produces the highest-selling guitar in the United States by

10   a large margin.  According to information in a legal brief submitted on behalf of Fender in a

11   recent trademark proceeding, the market share of Fender's three top selling models each year

12   exceeds the market share of the entire product line of most of Fender's largest competitors.

13   Fender is a member of NAMM, and is its largest exhibitor.

14        17.    Plaintiffs is informed and believes and thereon alleges that as to all transactions

15   relevant herein, each defendant was an agent of one or more defendants named herein and, as

16   such, was acting within the purpose, course and scope of such agency.  Plaintiff is further

17   informed and believes that each defendant aided and abetted, and acted in concert with and/or

18   conspired with each and every defendant to commit the acts complained of herein and to engage

19   in a course of conduct in the business practices complained of herein.

20        18.    Various individuals, partnerships, corporations and associations not named as

21   defendants in this Complaint have participated as co-conspirators in the violations of law alleged

22   herein and have performed acts and made statements in furtherance thereof.  The identity of all

23   co-conspirators is unknown at this time and will require discovery.

24                                         **TRADE AND COMMERCE**

25        19.    Defendants are involved in interstate trade and commerce, and the activities of

26   defendants as alleged in this action have substantially and adversely affect interstate commerce.

27   In the conduct of their business, defendants directly or indirectly, has used and uses the means

28   and instrumentalities of interstate commerce in furtherance of the acts and communications

alleged herein, including but not limited to, the United States postal system, the nationwide system, through and by means of which a substantial amount of the nation's communications, information exchanges, and transportation take place.

### SUBSTANTIVE ALLEGATIONS

**A.    The Fretted Instrument Product Market Is Part Of The Larger Musical Instrument Market Dominated By Defendants**

20.    According to data maintained by The Music Trades – the only industry trade publication - in the past six years, the ten largest music product suppliers have increased their market share from approximately 42% to 2002 to 50% in 2008.

21.    "Music product" companies are generally understood to include companies which manufacture, supply or sell at retail musical instruments, accessories and products for amplifying and recording music.

22.    According to The Music Trades, there are distinct product categories within the music product markets, including the fretted instrument product category, (consisting of acoustic and electric guitars, instrument amplifiers and strings), and pianos, consisting of acoustic and digital pianos, percussion products consisting of drums, cymbals and mallets.  Within the Fretted Instrument Product market, guitars are by far the most popular music instruments.

23.    In 2008, the Fretted Instruments Product category retail dollar sales volume was $1.55 billion of an approximately $7 billion dollar per year music instrument market.

24.    According to a national Gallop poll commissioned by NAMM (and conducted regularly since 1978) specialized music retail stores, such as those operated by defendants, remain the consumer's first choice for buying music products.  57% of poll respondents preferred to purchase at specialized music stores versus 23% who express a preference for internet purchases and only 15% expressing a preference for mass market retailers such as Best Buy, Costco, Wal-Mart or Toys-R-Us.  The mass market retailers' stock mainly lower-end guitars in the $250 or less range.

25.    The guitar and accessories product market is recognized as a distinct product market in the industry and has its own trade association, the Guitar and Accessories Marketing Association ("GAMA").

26.     Published figures from NAMM and The Music Trades reports that from 1998 to 2007 acoustic guitar sales grew to 1.35 million units from 611,00 and sales of electric guitars grew from 543,000 to 1.5 million units during the same period.

27.     According to a Music Trades report published in 2008, the music industry had gross margin of 30% versus approximately 22% gross margins for consumer electronics. Despite the large gross margins, the industry has been consolidating rather than attracting new entrants.  Even mass market retailers have decided not to compete with defendants herein on the same scale and scope.

28.     Confirming the barriers to entry into the music product retail market, one NAMM member observed (as reported in the March 1, 2008 issue of The Music Trades): "To generate reasonable sales volume, you need a lot of SKUs.  I am not sure they [Best Buy, then attempting to enter the music retailing market] will be able to achieve the kind of volume they're hoping for in just 2500 square feet of space."  In a published report in 2008, Morningstar's retail analyst, Brady Lemos, was quoted on the retailing music business as taking "up a lot of real estate." According to Guitar Center's published reports its average large store selling space is 8,000-80,000 square feet and stocks approximately 4,500 SKUs.  By contrast Best Buy has decided to enter the market in only a very limited way 91,250 square foot store within a store stocking only approximately 1000 SKUs.  Thus, new entrants to the market must make large investments in inventory and retail selling space.

**B.      Guitar Center's Dominance And Power In The Industry**

29.     Guitar Center has grown through acquisitions.  In June 1999, Guitar Center bought "Musicians Friend" a leading catalogue and instrument retailer with nine retail stores.  In April 2001, Guitar Center acquired American Music Group and its 12 retail stores, two mail-order catalogues and music accessory distributor.  In 2002, Guitar Center acquired M&M Music and Southwestern retailer of musical instruments to schools.  In mid 2005, Guitar Center bought Music & Arts Center and its 80 locations.  In 2006, Guitar Center acquired four Hermes Music stores in Texas.  In February 2007, Guitar Center acquired the Woodwind and The Brasswind out of bankruptcy.  As of the end of 2008, Guitar Center's annual sales of $1.55 billion were to

6

1    the musical instruments annual sales of $7 billion.

2       30.    Guitar Center is the only national chain and is viewed as dominant in the retail

3 market with 295 stores and the industry's largest mail order operation and sales of $2.0 billion,

4 GCI is nearly 5 times the size of its nearest competitor by 2007 according to Music Trades.

5 From 1997 to 2007, its market share has grown from 6.1% to 26.6%.

6       31.    Guitar Center dwarfs it next largest competitor. Sam Ash Music Corporation is

7 the number two musical instrument retailer in the United States and operates 45 stores in

8 California, New York and Texas and nine other states. In 2002, Sam Ash acquired the top nine

9 stores of the Mars Music Chain.

10       32.    According to independent retailers, Guitar Center wields enormous power in the

11 industry. In an interview in Musical Merchandise Review, April 2007 issue, Alan Levin of

12 Chuck Levin's Washington Music Center said:

13
14            The biggest concern is Guitar Center. They are many
           manufacturers' biggest customers and changes are being made. . .
           to suit them alone."
15

16       33.    One NAMM member observed (as reported in the March 1, 2008 issue of Music

17 Trades) "Guitar Center has too much leverage. . ."

18       34.    Guitar Center, is, according to its own publicly filed financial reports in 2007, the

19 largest customer of many of its suppliers and thus each manufacturer depends on GCI for

20 substantial portion of its sales of guitars and in Fender's case for a large share of its profits.

21       35.    The musical instrument product market is characterized by significant barriers to

22 entry which enhanced Guitar Center's dominance and influence and allowed defendants to

23 exercise and maintain control over prices of fretted instruments.

24       36.    The retail value of entire U.S. market for music and audio products in 2008, as

25 estimated by the Music Industry Census conducted by Music Trades, was $7.1 billion.

26       37.    In 2008, according to Musical Merchandise Review issue of July 2009, 171

27 outlets selling fretted instrument closed.

28

**C.     During The Class Period, NAMM Was The Industry's Vehicle To
Control Prices In The United States Fretted Instrument Product Market**

38.     Most U.S. manufacturers, distributors, and dealers of musical instructions are members of NAMM. As the FTC observed in its March 4, 2009 press release entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition,* "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for musical instructions, lobbying the government, offering seminars, and organizing trade shows. In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry." *See*, http://www.ftc.gov/opa/2009/03/namm.shtm.

39.     Between 2005 and 2007, NAMM organized various meetings and programs for its members at which competing retailers of musical instrument were permitted and encouraged to exchange information and discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.

40.     Representatives of NAMM determined the scope of information exchange and discussion by selecting moderator and setting the agenda for these programs.

41.     At these NAMM-sponsored events, NAMM members discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail price and margins; and other competitively sensitive issues.

42.     According to the FTC's complaint, "at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM discussed strategies for raising retail prices and exchanged information on competitively sensitive subjects such as – prices, margins, minimum advertised price policies and their enforcement."

43.     According to the FTC, similar discussions were held among manufacturers.

44.     NAMM shows are considered an indispensable resource by music product retailers. In a February 2007 interview a member was quoted in Musical Merchandise Review:

> Many years ago, the importance of attending a NAMM show may
> not have seemed important, today it is absolutely necessary.

Owners and key personnel should be at NAMM. . . the education seminars are priceless. The interaction with the industry people and colleagues is also priceless.

45.     The conduct of the defendants was the cause of supra competitive price levels for products in the Fretted Instrument Product market. Music Merchandise Review, issue date October 2008, reported that Anthem Music Group's head D. Kilkenny observed "over the past several years instrument prices seem to be increasing at a greater rate than that of inflation . . ." According to The Music Trades "Annual Census of The Music Industries" published in 2009, in 2006, the average price of guitar was $309 by 2007 the average price was $350 and by 2008 the average price was $372. Thus, the defendants were able to increase aggregate sales from $1,022,861.00 in 2006 to $1,151,290.00 despite a 10% decline in unit sales.

46.     The FTC has alleged that no significant pro-competitive benefit was derived from the challenged conduct. After analyzing the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions, the FTC concluded that the exchange of information engineered by NAMM lacked a pro-competitive justification.

47.     The FTC has ordered NAMM to cease and desist from:

(a)     Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

(i)      the retail price of any Musical Product;

(ii)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(iii)    the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

9

(b)     urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

(i)     the retail price of Musical Products; or

(ii)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

**D.     Anticompetitive Effects Of Defendants' Unlawful Conduct**

48.     The MAP policies imposed and enforced by defendants here went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.

49.     The MAP policies inflicted on music retailers by NAMM and manufacturers are anticompetitive.  According to a Wall Street Journal Report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc. said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

50.     Defendants' practices have had the following anticompetitive effects, among others, in the relevant market:

(a)     Competition in the relevant market has been unreasonably restrained, suppressed, and, in some cases, destroyed;

(b)     Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against defendants;

(c)     Purchasers of musical instruments have been denied the benefits of competition in a free and open market and have been forced to pay artificially high instrument prices;

CLASS ACTION COMPLAINT

1          (d)     Upon information and belief, defendants have enjoyed, and will continue

2   to enjoy, ultra competitive profits to the detriment of competitors and purchasers of musical

3   instruments.

4        51.     The aforementioned anticompetitive effects of defendants conduct on competition

5   in the relevant market outweigh any conceivable pro-competitive benefits.

6       **E.**    **Market Power**

7        52.     As of those claims for which proof of market power is required (*i.e.*, those for

8   which the rule of "per se" illegality does not apply), the relevant product market in this case is

9   retail sales of products in the fretted instruments product category which includes guitars

10  amplifiers and accessories for same.

11       53.     The relevant geographic market in this case is the United States of America.

12       54.     As small but significant non transitory price increase in fretted instrument product

13  category would not result in a loss of sales within this product market to sales in other music

14  product categories.

15       55.     By virtue of their power to control prices and exclude competition in the relevant

16  markets(s), defendants' at all relevant times possessed market power in the relevant market(s).

17  Moreover, at all relevant times defendants possessed dominant shares of the market(s) for retail

18  sales of musical instruments generally fretted instruments in particular.

19       56.     Likewise, defendants at all relevant times possessed substantial market power in

20  the market(s) for its products, due, in part, to the high level of product differentiation in the

21  industry.  Specifically, defendants:  (a) sold their musical instruments at prices substantially in

22  excess of marginal costs, (b) enjoyed high profits margins thereon, (c) sold such products

23  substantially in excess of the competitive price, and (d) enjoyed substantial barriers to market

24  entry and growth.

25       57.     Defendants exchanged competitively sensitive information that had the purpose,

26  tendency and capacity to facilitate price coordination among competitors.

27       58.     There is substantial concentration among the firms that manufacture the products

28  in the relevant market(s).

59.   Defendants together imposed and enforced minimum retail price maintenance and minimum advertised price policies which were contrary to manufacturers' economic interests because each manufacturer rational economic goal was to increase sales volume rather than terminate retailers.

**F.   Market Effects Of Defendants' Conduct**

60.   The overall effect of defendant's anti-competitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced musical instruments.  As alleged above, had defendants not improperly foreclosed or stifled actual or potential competitors from competing in markets for the musical instruments, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far great competitive threat to defendants. Additionally, absent defendants exclusionary conduct, barriers to entry of the markets would have been lower, which:  (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for the musical instruments, and (b) would have caused existing or potential competitors to be attracted to the musical instrument market because of the supra-competitive prices that defendants was charging.  As a result, absent defendants' misconduct, defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if defendants did not reduce its supra-competitive prices.

61.   The presence of unfettered competition from actual or potential competitors, which were selling lower-priced musical instruments, would have forced defendants to lower the prices for its musical instruments in order to remain competitive and/or to counter a perceived threat of additional entry.

62.   As a result of defendants' conduct, independent retailers could not compete with nationwide and/or multiregional claims because the retailers could not price-compete. Accordingly, retailers such as Guitar Center were able to raise prices above and beyond what they would be under competitive conditions.

63.     During the relevant period, plaintiff and the other members of the Class purchased musical instruments directly from defendants.  As a result of defendants alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the musical instruments they purchased.  Plaintiff would have been able to, *inter alia*, purchase less-expensive musical instruments had potential competitors been able to engage in unfettered competition.  The prices that Plaintiff and the other Class members paid for musical instruments during the Class Period were substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because:  (1) the prices of all musical instruments were artificially inflated by defendants illegal conduct; and (2) Class members were deprived of the opportunity to purchase musical instruments at substantially lower prices.  Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

### CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All individuals and persons who purchased one or more Fretted Instrument Products from any of the defendants from January 1, 2005 through December 2007 ("Class Period").

Excluded from the Class are the defendants, their co-conspirators, their respective parents, subsidiaries and affiliates, any judge or magistrate presiding over this action and members of their families, as well as any governmental entities.

65.     Plaintiff does not know the exact size of the Class since such information is exclusively in the control of defendants.  Plaintiff believes that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

66.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged in this Complaint.

67.     Plaintiff will fairly and adequately protect the interests of the Class.  The interests

13

1    of Plaintiff coincide with and are not antagonistic to, those of the Class.  In addition, Plaintiff is

2    represented by counsel who are experienced and competent in the prosecution of complex class

3    action and antitrust litigation.

4       68.     There are questions of law and fact common to the members of the Class, and

5    those common questions predominate over any questions which may affect only individual

6    members of the Class, because defendants have acted on grounds generally applicable to the

7    entire class.  Among the predominant questions of law and fact common to the Class are:

8          (a)     Whether defendants conspired and/or engaged in concerted action or

9    unilateral action in restraint of trade;

10         (b)     Whether defendants intentionally and unlawfully engaged in a scheme to

11    control price and potential competitors from the relevant market;

12         (c)     Whether defendants' unlawful conduct caused Plaintiff and the Class

13    members to pay more for Fretted Instrument Products than they otherwise would have paid;

14         (d)     The duration and extent of the combination or conspiracy alleged herein;

15         (e)     Whether defendants and their co-conspirators were participants in the

16    combination or conspiracy alleged herein;

17         (f)     Whether the allged combination or conspiracy violated Section 1 of the

18    Sherman Act;

19         (g)     The effect of the combination or conspiracy upon the prices of Fretted

20    Instrument Products sold in the United States during the Class Period;

21         (h)     Whether plaintiff and members of the Class are entitled to declaratory,

22    equitable and/or injunctive relief;

23         (i)     Whether plaintiff and the Class have been damaged and the appropriate

24    measure of such damages;

25         (j)     Whether defendants engaged in agreements, contracts, combinations and

26    conspiracies which had the purpose and/or effect of unreasonably restraining competition and

27    limiting purchasers' access to competing and lower priced Fretted Instrument Products; and

28         (g)     Whether defendants unreasonably anti-competitive contracts, contribution

1    and conspiracies have caused plaintiff and other class members to suffer injury to their business

2    or property.

3        69.    Class action treatment is a superior method for the fair and efficient adjudication

4    of the controversy, in that, among other things, such treatment will permit a large number of

5    similarly situated persons to prosecute their common claims in a single forum simultaneously,

6    efficiently, and without the unnecessary duplication of evidence, effort, and expense that

7    numerous individual actions would engender.  The benefits of proceeding through the class

8    mechanism, including providing injured persons or entities with a method for obtaining redress

9    for claims that might not be practicable to pursue individually, substantially outweigh any

10   difficulties that may arise in management of this class action.  There are no difficulties likely to

11   be encountered in the management of this class action that would preclude its maintenance as a

12   class action and no superior alternative exists for the fair and efficient adjudication of this

13   controversy on behalf of plaintiff and the members of the Class.

**FIRST CLAIM FOR RELIEF**

**(Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)**

16       70.    Plaintiff incorporates by reference all the above allegations as if fully set forth

17   herein.

18       71.    Beginning in 2005, the exact date being unknown to plaintiff and exclusively

19   within the knowledge of defendants and their coconspirators entered into a continuing contract,

20   combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1

21   of the Sherman Antitrust Act (15 U.S.C. § 1) by artificially reducing or eliminating competition

22   in the United States.

23       72.    In particular, defendants combined and conspired to raise, fix, maintain or

24   stabilize the prices of Fretted Instrument Products sold in the United States.

25       73.    As a result of defendants' unlawful conduct, prices for Fretted Instrument

26   Products were raised, fixed, maintained and stabilized in the United States.

27       74.    The contract, combination or conspiracy among defendants consisted of a

28   continuing agreement, understanding, and/or concerted action among defendants and their co-

1    conspirators.

2        75.    For purposes of formulating and effectuating their contract, combination or

3    conspiracy, defendants and their co-conspirators did those things they contracted, combined, or

4    conspired to do, including but not limited to:

5            (a)    participating in meetings and conversations to discuss the prices and

6    supply of Fretted Instrument Products;

7            (b)    communicating in writing and orally to fix target prices, floor prices, and

8    price margins for Fretted Instrument Products;

9            (c)    exchanging competitively sensitive information among each other to

10   facilitate their conspiracy, including minimum advertised pricing, strategies for raising retail

11   prices, restricting retail price competition;

12           (d)    agreeing to manipulate prices and supply of Fretted Instrument Products

13   sold in the United States in a manner that deprived direct purchasers of free and open

14   competition; and

15           (e)    selling Fretted Instrument Products to customers in the United States at

16   noncompetitive prices.

17       76.    As a result of defendants' unlawful conduct, plaintiff and the other members of

18   the Class were injured in their businesses and/or property in that they paid more for Fretted

19   Instrument Products than they otherwise would have paid in the absence of defendants' unlawful

20   conduct.

21                    **SECOND CLAIM FOR RELIEF**

22   **(Against All Defendants for Violation of 15 U.S.C. § 1 -Agreements Restraining Trade)**

23       77.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

24   fully set forth herein.

25       78.    Defendants through their actions described above constituting agreements, and

26   their enforcement, contracts, combinations and conspiracies that substantially, unreasonably, and

27   unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

28       79.    The relevant product market is Fretted Instrument Products and the relevant

                                16

1   geographic market is the United States.

2       80.     The action alleged covers a sufficiently substantial percentage of relevant

3   market(s) to harm competition.

4       81.     The actions of the defendants directly and/or through NAMM constitute concerted

5   action.

6       82.     NAMM is *per se* liable for the creation, maintenance, and enforcement of the

7   agreements under a "quick look" and/or rule of reason standard.

8       83.     Alternatively, NAMM is liable for the creation, maintenance, and enforcement of

9   the agreements under a "quick look" and/or rule of reason standard.

10      84.     There is no legitimate, pro-competitive business justification for defendants'

11  conduct, or any of them, that outweighs their harmful effect.

12      85.     Plaintiff and members of the Class were injured in their business or property by

13  the collusion and conspiracy alleged above which facilitates, enabled, and assisted or further

14  defendants' substantial foreclosure and exclusion of competition in the relevant markets.

15  Without limiting the generality of the foregoing, plaintiff and the other members of the Class

16  have been forced to pay higher prices for musical instruments than they would have paid in the

17  absence of defendants' unlawful conduct.

18                          **THIRD CLAIM FOR RELIEF**

19                    **(Against Defendants Namm and Guitar Center for**
    **Violation of the Sherman Antitrust Act, 15 U.S.C. § 2 - Attempted Monopolization)**
20

21      86.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though

22  fully set forth herein.

23      87.     Guitar Center has conspired with NAMM to control prices and exclude or destroy

24  competition in the relevant markets and engaged in other acts with the specific interest to achieve

25  monopoly power in the relevant product market.

26      88.     Guitar Center possesses, and has demonstrated, a dangerous probability of

27  achieving monopoly power in the relevant market.  Guitar Center continues to dominate this

28  market through the unlawful conduct described above, to the detriment of plaintiff and the Class.

89.     As a direct and proximate result of Guitar Center's monopolistic conduct, competition in the relevant market has been unreasonably restrained and injured, and plaintiff and the members of the Class have paid supra competitive prices for musical instruments.  As a result of defendant's unlawful conduct, plaintiff and members of the Class have suffered and will continue to suffer damages.

## FOURTH CLAIM FOR RELIEF

**(Against All Defendants for Violation of California's Unfair Competition Law)**

90.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

91.     Defendants' acts and practices, as described herein, constitute unlawful, unfair or fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

92.     The utility of defendants' conduct and practices in restricting competition in the musical instruments market is significantly outweighed by the gravity of the harm they impose on plaintiff and the Class.  Defendants' acts and practices are oppressive, unscrupulous or substantially injurious to consumers.

93.     The above-described unfair, unlawful and fraudulent business practices conducted by defendants present a threat and likelihood of harm and deception to members of the class in that defendant has systematically perpetrated and continues to perpetrate the unfair, unlawful and fraudulent conduct upon them.

94.     Defendants' acts and practices constitute unlawful business practices in violation of the Sherman Antitrust Act, Sections 1 and 2, as described herein.

95.     Plaintiff and the Class have suffered harm as a proximate result of the wrongful conduct of the defendants alleged herein, and therefore bring this claim for restitution and disgorgement.  Plaintiff and the class have suffered injury in fact and have lost money as a result of defendants' acts and practices, described herein, in that they have paid artificially high prices for musical instruments due to defendants' unlawful agreement, combination or conspiracy.

18

96.    In paying the prices they paid for musical instruments, plaintiff and members of the class relied upon defendants to fairly and lawfully charge retail prices that were unaffected by any restraint of trade.

97.    Pursuant to Business and Professions Code §§17200 and 17203, plaintiff, on behalf of himself and the class, seek an order of this Court: enjoining the defendants from continuing to engage in the practices described herein.  Plaintiff and the class are further entitled to, and pray for, restitution of all monies owed to them, subject to proof, as a result of defendants' unfair, unlawful and fraudulent practices, along with disgorgement of profits, plus interest and attorneys' fees and costs pursuant to, *inter alia*, Code of Civil Procedure §1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that:

A.    The Court determines that this action may be maintained as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring plaintiff as the representative of the Class and his counsel as counsel for the Class;

B.    The Court declares the conduct alleged herein to be unlawful in violation of the federal antitrust laws and the common law of unjust enrichment;

C.    Plaintiff and each member of the Class recover punitive and treble damages to the extent such are provided by the law;

D.    Plaintiff and each member of the Class recover the amounts by which the defendants have been unjustly enriched in accordance with state law;

E.    Defendants be enjoined from continuing the illegal activities alleged herein;

F.    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

/ / /

/ / /

/ / /

1    G.    Plaintiff and the Class be granted such other, further, and different relief as the

2    nature of the case may require or as may be determined to be just, equitable and proper by this

3    Court.

### DEMAND FOR JURY TRIAL

4

5    Plaintiff hereby demands a trial by jury on all claims so triable.

6    Dated: September 11, 2009                    **WEXLER WALLACE LLP**

7

8                                                By: _____

9                                                        Mark J. Tamblyn

10                                               455 Capitol Mall, Suite 231
                                                 Sacramento, CA  95814
11                                               Telephone:  (916) 492-1100
                                                 Facsimile:  (916) 492-1124
12
                                                 **SQUITIERI & FEARON, LLP**
13                                               Lee Squitieri
                                                 Garry Stevens
14                                               32 East 57th Street, 12th Floor
                                                 New York, New York 10022
15                                               Telephone:  (212) 421-6492
                                                 Facsimile:  (212) 421-6553
16
                                                 Attorneys for *Plaintiff, individually and on
17                                               behalf of the proposed Class*

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

ORIGINAL

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| David Giambusso, individually and on behalf of all others similarly situated | 2009 SEP 11 PM 3:00 National Association of Music Merchants, Inc.; Guitar Center, Inc.; Fender Musical Instruments Corp. |

(b) County of Residence of First Listed Plaintiff  **Brooklyn, New York**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **San Diego County**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Mark J. Tamblyn, Wexler Wallace LLP, 455 Capitol Mall, Suite
Sacramento, California 95814/ Tel. (916) 492-1100

Attorney's (If Known)

'09 CV 2001 LAB    JMA   BY FAX

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

II. BASIS OF JURISDICTION

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. sections 1 and 2, 28 U.S.C. Section 1332(d)
Brief description of cause:
Agreement to restrain trade/attempt to monopolize/violation of unfair competition law

| VII. REQUESTED IN COMPLAINT: | ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ over $5,000,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☑ Yes ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instructions): | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE
09/11/2009

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 5/33   AMOUNT $350.00   APPLYING IFP   JUDGE   MAG. JUDGE

MS 9/11/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005133
Cashier ID: msweaney
Transaction Date: 09/11/2009
Payer Name: ONE LEGAL LLC
--------------------------------
CIVIL FILING FEE
 For: D.GIAMBUSSO V MUSIC MERCHANTS
 Case/Party: D-CAS-3-09-CV-002001-001
 Amount:        $350.00
--------------------------------
CHECK
 Check/Money Order Num: D3108954
 Amt Tendered:  $350.00
--------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```