1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13

| | |
|---|---|
| IN RE:  National Association of Music Merchants, Musical Instruments and Equipment Antitrust Litigation | MDL No. 2121 |
| | (USDC Case Nos. 09cv2002, 09cv2146, 09cv2151, 09cv2211, 09cv2267, 09cv2285, 09cv2332, 09cv2418, 09cv2423) |
| | **ORDER DENYING MOTION TO STRIKE; AND GRANTING IN PART MOTIONS TO DISMISS** |
| | **[Docket numbers 76, 81, 83, 84.]** |

14
15
16
17
18

After Plaintiffs filed their consolidated complaint, Defendant National Association of

19 Music Merchants (NAMM) moved to strike references to a Federal Trade Commission

20 investigation and consent decree, and all Defendants moved to dismiss.  The Court received

21 briefing on all the motions and held argument.  After considering the motions and arguments

22 thoroughly, the Court is now prepared to rule. At argument, the Court suggested it would rule

23 quickly, but it has turned out this was not possible.  The Court apologizes to the parties for

24 the delay in ruling on these motions, which was occasioned by unexpected demands on the

25 Court's criminal docket.

26 **I.      Motion to Strike**

27        This motion seeks to strike the complaint's allegations to the FTC's investigation, and

28 the consent decree NAMM entered into.  Beginning in 2007, the FTC investigated the music

1    products industry.  NAMM settled with the FTC, agreeing to a consent decree without

2    admitting wrongdoing, and also argues the FTC investigation didn't uncover any wrongdoing.

3        NAMM argues the investigation never uncovered evidence of wrongdoing.  The FTC's

4    decision and order says the FTC had reason to believe NAMM had violated section 5 of the

5    Federal Trade Commission Act (which declares "unfair methods of competition, and unfair

6    or deceptive acts or practices" unlawful and gives the FTC power to issue cease and desist

7    orders).  In short, it appears the FTC ordered NAMM not to do certain things, without making

8    factual findings that what NAMM was doing was an unlawful practice.

9        NAMM points out the Clayton Act, 15 U.S.C. § 16(a), provides that the FTC's final

10   antitrust judgments or decrees can be used as evidence of wrongdoing in later civil litigation,

11   but under this same section, consent decrees, or decrees entered before any testimony is

12   taken, don't constitute evidence of wrongdoing.  To be clear, this section doesn't forbid

13   referring to such decrees in allegations, nor does it forbid them from being admitted for some

14   other purpose.

15       In reply, Plaintiffs argue they are only citing the investigation and consent decree for

16   purposes of meeting the plausibility requirement of *Bell Atlantic v. Twombly*, 550 U.S. 544

17   (2007).  They cite a recent district court opinion, *In re Packaged Ice Antitrust Litigation*, 723

18   F. Supp. 2d 987 (E.D.Mich., 2010), which considered government investigations as

19   bolstering the plausibility analysis and "heighten[ing] the Court's expectation that 'discovery

20   will reveal evidence of illegal agreement.'" *Id.* at 1009 (quoting *Bell Atlantic* at 556). That

21   case also cited *Hinds County v. Wachovia Bank*, 700 F. Supp. 2d 378, 394–95 (S.D.N.Y.

22   2010) for the principle that "pending government investigations could be used to enhance

23   the plausibility of plaintiffs' claims. . . ."  *Hinds County* in turn cites a number of other cases

24   where government investigations of price fixing supported the plausibility analysis.  Among

25   these was *In re Tableware Antitrust Litig.*, 363 F. Supp.2d 1203, 1205 (N.D.Cal., 2005),

26   which aptly held "A plaintiff may surely rely on governmental investigations, but must also

27   . . . undertake his own reasonable inquiry and frame his complaint with allegations of his own

28   design."  The Court agrees with this holding.

09CV2002

1    Although these cases concern motions to dismiss and consider allegations about
2  investigations as part of plaintiffs' attempt to resist dismissal, they are also apposite in the
3  context of a motion to strike impertinent material from the complaint.

4    Plaintiffs also point out the Clayton Act doesn't forbid using the consent decree to
5  support allegations against other Defendants.  The weight of authority appears to be that
6  such investigations can properly be included in the complaint, but that they are far from
7  sufficient to show a conspiracy to fix prices.  It is also worth noting that the consent decree
8  suggests that the investigation uncovered matters of, at the very least, matters of concern
9  to the FTC.  Had the FTC merely investigated the matter and dropped it, the investigation
10  would be a non-factor.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d
11  1011, 1024 (N.D.Cal, 2007) (uncompleted grand jury investigation "carrie[d] no weight in
12  pleading an antitrust claim," because it was "unknown whether the investigation [would]
13  result in indictments or nothing at all" and secrecy requirements prevented the scope of the
14  investigation from becoming known).

15    Because the consolidated complaint is being dismissed with leave to amend, the
16  Court need not strike any material.  Assuming Plaintiffs are able to amend, they will not be
17  barred from referring to the investigation and consent decree.

18  **II.    Motions to Dismiss**

19    All three motions to dismiss make essentially the same argument: that the complaint
20  is too vague and conclusory, lacking in specifics, and fails to meet the pleading standard
21  under *Bell Atlantic*, including both specificity and plausibility. Defendants also attack the
22  complaint's plausibility using what are essentially factual arguments.  Each of the motions
23  to dismiss also raises unique issues, which will be discussed in individual sections.

24    Because full briefing was received and full argument was held, the Court will not
25  discuss all details of the claims and arguments, except as necessary for its ruling.

26    **A.    Core Allegations**

27    NAMM is a nonprofit trade association with over 9,000 members, including most
28  manufacturers, and dealers of musical instruments and related products.  Guitar Center is,

by far, the largest retailer of musical instruments, selling five times as much as the second-place retailer and fifteen times as much as the third.  The remaining Defendants, Fender, Gibson, Hoshino (Ibanez), Kaman, and Yamaha are manufacturers.  These manufacturers dominate the high-quality market.

The consolidated complaint alleges that, in response to competition from internet retailers, NAMM and music retailers and advertisers in 2004 entered into an agreement or conspiracy to set the minimum prices (MAPPs, or MAPs) that could be advertised for fretted instruments and guitar amplifiers (collectively, Musical Instruments and Equipment).  The consolidated complaint alleges this served no legitimate business purpose, and its only purpose was to fix retail prices for fretted instruments and guitar amplifiers.

The allegations are supported by financial data showing an increase in the number of units sold and a decrease in the average price per unit from 1997 to 2004, followed by a slight drop in the number of instruments sold accompanied by steady or slightly increased prices from 2005 to 2008.  (Guitars increased in price after 2004, and amplifiers increased slightly or held steady.)  The figures are persuasive that something happened around 2004 to change the trend, though by themselves they don't show what that was.

The consolidated complaint is specific as to the meetings where the alleged conspiracies took place and discusses some of what was discussed at each show.  (Compl., ¶¶ 92-107.)  It alleges the conspirators (the Defendants and possibly others not named) met together at NAMM's two annual trade shows over a period of years and conspired at these meetings from 2004 to 2007.  These shows were held from the mid-1990s through at least 2008, and the complaint alleges NAMM members were encouraged to and did discuss strategies for restricting price competition.  (*Id.*, ¶ 75.)  Paragraphs 85 through 87 discuss the content of the agreements.  The alleged conspiracy was a vertical conspiracy, with Guitar Center as the hub.  There is no allegation of horizontal conspiracy, between retailers or between manufacturers directly.  At argument, Plaintiffs confirmed they intended to allege a hub and spoke conspiracy.

/ / /

1   The complaint also alleges the effects of the agreements, which included raising

2   prices and restraining competition.  This is supported by economic data, as noted, and by

3   allegations about the effects on the market.  (Compl. ¶¶ 108, 109, 114.)

4   **B.    Pleading Standard**

5   The starting point for the Court's determination of the pleading standard is *Bell*

6   *Atlantic v. Twombly*, an antitrust case.  The basic standard is that the complaint must give

7   the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  550

8   U.S. at 555.  Unless a plaintiff is pleading one of the conditions identified in Fed. R. Civ. P.

9   9(b) (i.e., fraud or mistake), there is no heightened pleading standard.  *Id.* at 569 n14.  A

10   complaint for violation of Section 1 of the Sherman Act must provide "enough factual matter

11   (taken as true) to suggest that an agreement was made." *Id.* at 556. The facts alleged must

12   "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

13   "Asking for plausible grounds to infer an agreement does not impose a probability

14   requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

15   expectation that discovery will reveal evidence of illegal agreement." *Id.*

16   The leading Ninth Circuit case interpreting *Bell Atlantic*, *Kendall v. Visa U.S.A., Inc.*,

17   518 F.3d 1042 (9th Cir. 2008) was also an antitrust action and emphasized *Bell Atlantic's*

18   abrogation of notice pleading in antitrust cases.  518 F.3d at 1047 n.5.  Like *Bell Atlantic*,

19   *Kendall* requires more than a "bare allegation of a conspiracy," which is "almost impossible

20   to defend against," *id.* at 1047, but instead requires allegation of "facts such as a 'specific

21   time, place, or person involved in the alleged conspiracies' to give a defendant seeking to

22   respond to allegations of a conspiracy an idea of where to begin." *Id.* (quoting *Bell Atlantic*

23   at 1970 n.10).  Specifically, *Kendall* requires a plaintiff bringing a claim under Section 1 of

24   the Sherman Act to plead

25   evidentiary facts which, if true, will prove: (1) a contract, combination or
    conspiracy among two or more persons or distinct business entities; (2) by
26   which the persons or entities intended to harm or restrain trade or commerce
    among the several States, or with foreign nations; (3) which actually injures
27   competition.

28   *Id.* (citations omitted).

1    To withstand a motion to dismiss, antitrust claims must be "plausible in light of basic

2  economic principles." *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*, 588 F.3d

3  659, 662 (9th Cir. 2009) (citing *Bell Atlantic*, 550 U.S. at 556) (internal quotation marks

4  omitted).

5         **C.     Analysis of Arguments Common to Motions to Dismiss**

6         While the consolidated complaint's claims are not, taken as a whole, implausible, they

7  are implausible in some respects and lack sufficient detail to meet the standard announced

8  in *Bell Atlantic* and explained further in *Kendall*.

9         While the complaint identifies the place and time period, the instruments and other

10 equipment that were the target of the alleged conspiracy are not sufficiently identified,

11 resulting in a failure to allege markets or submarkets (*i.e.*, buyers of specific types of

12 instruments or other types of products) adequately.  Grouping various musical instruments

13 and amplifiers together results in an unidentifiable and overly broad market, primarily

14 because fretted musical instruments are not reasonably interchangeable.  To illustrate,

15 customers do not typically choose between one type of fretted instrument (*e.g.*, an electric

16 guitar) and others (*e.g.*, a banjo or mandolin).  Some of the products, such as electric guitars

17 and amplifiers, are complimentary, meaning customers use them together; but others are

18 not.  In short, as pleaded, the markets are blurred, and the and products sold would not

19 plausibly be part of a single price fixing conspiracy.

20        This is not to say Plaintiffs could not narrow the definitions or that they would need

21 discovery to do so.  Plaintiffs have market data and should be able to identify and allege the

22 products and markets targeted by the alleged price-fixing conspiracy, instead of making

23 generalized claims based on all fretted instruments.  This is particularly important because

24 not all Defendants sell all types of instruments.

25        Defendants have also criticized Plaintiffs' focus on the higher-end market, but this

26 argument is equivocal.  It is true that cheaper instruments might be considered to be in the

27 same market, because they could serve as alternatives for customers who cannot afford the

28 higher-end models; *i.e.*, a customer who cannot afford an expensive guitar is likely to at least

1    consider a low-end one.  On the other hand, it is unclear how common it is for a customer

2    to settle for a low-end instrument; certainly there are plausible scenarios where a low-end

3    instrument would be unacceptable as a substitute.  Focusing on higher-end instruments also

4    has the effect of narrowing the alleged market, which is of some help to Plaintiffs.  The

5    degree to which high-end instruments and low-end instruments are in the same market is

6    a factual matter which is not ripe for decision at this point, but when they amend to clarify the

7    products and market at issue, Plaintiffs should take this issue into account.

8          The consolidated complaint also fails to allege evidentiary facts sufficient to show the

9    existence of a conspiracy sufficient to affect competition.  Although a conspiracy of each

10   Defendant with all other Defendants would have sufficient market influence to affect

11   competition, Plaintiffs can't plausibly allege such a conspiracy.

12         At argument, Plaintiffs made clear they intended to allege a hub and spoke

13   conspiracy.  Defendants, however, pointed out the or nonexistence existence of agreements

14   between the "spokes," or an agreement with the "hub" regarding what the other "spokes"

15   would do would affect both whether the alleged conspiracy possessed sufficient market

16   power, and whether it was economically logical.  To illustrate, Defendants pointed out the

17   lack of clarity regarding whether Plaintiffs were alleging a "rimmed wheel" or "rimless wheel"

18   conspiracy.  *See United States v. Zapetis*, 2010 WL 917865, slip op. at *1 (M.D.Fla., March

19   11, 2010) (explaining the structure of "rimmed wheel" and "rimless wheel" conspiracies).  In

20   a rimless wheel conspiracy, various defendants enter into an agreement with a common

21   defendants, without having any connection to one another.  *See, e.g., Dickson v. Microsoft

22   Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).  A "rimmed wheel" conspiracy, by contrast, involves

23   either an agreement or understanding that other "spokes" would cooperate in the conspiracy.

24   *See Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 931–36 (7th Cir. 2000) (describing structure

25   of conspiracy).[1]  The horizontal agreement (among manufacturers) may be shown by direct

26   / / /

27   _____

28        [1] The Seventh Circuit itself did not describe this as a "rimmed wheel" conspiracy; this application of the term, which the Court finds helpful, comes from other cases but the Court finds it helpful here.

1   or circumstantial facts, but if the latter are pleaded, Plaintiffs must also plead facts tending

2   to exclude the possibility of simple parallel action without an agreement.  *See id*. at 934–35.

3          The Court agrees the consolidated complaint lacks adequate detail. It is not clear who

4   is alleged to have conspired with whom, what exactly they agreed to, and how the conspiracy

5   was organized and carried out.  In essence, it merely alleges some kind of agreement, and

6   the charging of higher prices as a result.  This is essentially what *Bell Atlantic* held was

7   inadequate:

8              [A]n allegation of parallel conduct and a bare assertion of conspiracy will not
               suffice.  Without more, parallel conduct does not suggest conspiracy, and
9              a conclusory allegation of agreement at some unidentified point does not
               supply facts adequate to show illegality.

10

11   550 U.S. at 556.  The consolidated complaint therefore falls short of the *Bell Atlantic* and

12   *Kendall* standard.  At this point, Plaintiffs frankly admit they lack the information to plead

13   specific facts in good faith, and seek discovery so they can learn who attended the meetings

14   they have generally identified, what was said, and what was agreed.

15          The role of NAMM is likewise not particularly well alleged, though the allegations are

16   not as badly flawed as NAMM argues.  If as alleged NAMM urged its members not to

17   compete on pricing and agreed with Guitar Center and the other Defendants to strictly

18   enforce anticompetitive MAPPs (Complaint, ¶ 85), that by itself would show NAMM's

19   involvement.  NAMM's involvement in a conspiracy to fix consumer prices is plausible.

20   Presumably, NAMM's interests are aligned with manufacturers in general, and probably even

21   more strongly with the more influential manufacturers, and would favor a rise in consumer

22   prices.

23          That said, it is implausible and economically illogical that NAMM could and would

24   conspire with all 9,000 of its members, and that all 9,000 would agree to the plan.  As NAMM

25   has pointed out, most of its members would probably not benefit from the type of agreement

26   alleged here.  In addition, the logistics of such a conspiracy would render it impractical.  The

27   Court does not agree that this defect is incurable, however.  Plaintiffs can more specifically

28   allege the subset of members with which they believe NAMM conspired.  NAMM has argued

1  such a conspiracy would be implausible because most of the organization's members would
2  be hurt rather than benefitting.  But it is plausible that an organization might conspire with
3  more favored or influential members, even if the conspiracy hurt other members.

4  **D.    Roland's Arguments**

5  Roland argues it sold only amplifiers and not fretted instruments, didn't attend the
6  meeting where the alleged agreement took place, and never had minimum advertised prices.
7  Its CEO and president, Dennis Houlihan, however, served on the NAMM board and was its
8  first commercial chairman from 2005 to 2007.  This is a fact-based rebuttal, since the
9  consolidated complaint alleges that Roland (and the other Defendants) did these things.  For
10  example, it alleges Roland sold electronic guitars.  Without converting the motion to dismiss
11  into a summary judgment motion, *see* Fed. R. Civ. P. 12(d), the Court must accept factual
12  allegations as pleaded.

13  Roland also argues the critical allegations aren't specific to it.  In other words, there's
14  no allegation about what Roland's officers did, only about what manufacturers in general did.
15  This is true of all the Defendants, not just Roland. The Court agrees with Roland's objection,
16  but this defect can be cured by amendment, provided Plaintiffs are able to make specific
17  allegations.

18  Roland also argues that the allegations are implausible because, if as alleged the
19  other Defendants agreed to raise the price of guitars, the demand for guitar amplifiers would
20  fall.  *See Sheridan v. Marathon Petroleum Co., LLC*, 530 F.3d 590, 593 (7th Cir. 2008) ("If
21  the price of nails rises, the demand for hammers will fall.")  In other words, Roland is arguing
22  the alleged conspiracy is economically irrational.  It is consistent with the data for amplifier
23  sales given in ¶ 73 of the complaint, though; while the price of guitars rose from 2004 to
24  2008, the price of amplifiers increased only slightly or held steady.  But because the Court
25  must at this stage accept the complaint's allegation that Roland sold electric guitars, this
26  argument must fail.

27  / / /
28  / / /

**E.    Other Manufacturers' Arguments**

The other manufacturers argue MAPPs by themselves don't restrain trade because they only limit the prices that may be advertised, not the prices at which goods may be sold. In support of this, they cite *Campbell v. Austin Air Sys., Ltd.*, 423 F. Supp. 2d 61, 68–70(W.D.N.Y. 2005).   Under the *Sylvania* doctrine, non-price restrictions imposed by manufacturers aren't illegal per se, but are examined under the "rule of reason." *Continental T.V., Inc. v. GTE Sylvania*, Inc., 433 U.S. 36, 49–50 (1977).   Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.*   But *Campbell*'s holding is too narrow to be of help to Defendants here; in that case, the court found a MAP regulating internet advertising but exempting all other sales prices didn't violate the rule of reason. *Campbell* at 68 n.6.

Defendants also argue that Plaintiffs concede Defendants' adoption of MAPs in the 1990 resulted in lower prices.   Here, however,  the complaint implies that the agreements in 2004 and later were aimed at controlling prices perceived as too low.   MAPs with terms different from those in earlier MAPs wouldn't be expected to have the same effects.   The Court does agree, however, that Plaintiffs must plead enough of the MAPs' terms to show how they restrained competition.

Defendants argue the FTC's two-year investigation didn't find any evidence of conspiracy, implying that this means no wrongdoing occurred. They also argue the FTC's investigation focused only on agreements among retailers, not manufacturers, and that the FTC's failure to find evidence of agreements among manufacturers shows this was implausible.   None of this is remarkable or persuasive, however, because the matter was settled by consent decree before the investigation was completed.   Just as the FTC's investigation is not sufficient to show a conspiracy existed, the conclusion of the investigation by consent decree does not show no conspiracy existed.   *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1024 (noting that Department of Justice's decision not to prosecute would not be binding on plaintiffs).

- 10 -

09CV2002

1    Plaintiffs may be able to clarify their claims by alleging the markets more specifically.

2    The Court does not at this point rule out the possibility that Plaintiffs will be able to allege

3    Defendants conspired with regard to several different markets.

4    Defendants also make a point of arguing that the complaint doesn't allege the nature

5    of the conspiracy, and use this to make an argument against standing.  They cite *Illinois*

6    *Brick v. Illinois*, 431 U.S. 720 (1977) for the principle that a plaintiff who buys a product

7    *indirectly* from conspirators lacks standing.  This misses the point, though, because all

8    Plaintiffs bought items directly from Guitar Center, an alleged conspirator.

9    Defendants also question the reliability or persuasive value of statements by third

10   parties, economic data, and other specifics in the complaint.  Whether any of these are

11   ultimately admissible, the purpose of the complaint isn't to identify evidence, but to identify

12   the nature of the claims.  The data, statements, etc. are alleged for that purpose, to suggest

13   the nature of the claims and the kind of evidence discovery is expected to reveal.  In any

14   event, because the Court is not converting the motions to dismiss into summary judgment

15   motions, the Court considers only the allegations.

16   Defendants also argue the complaint fails to allege they have any market power, and

17   thus the allegations are implausible.  This is a different argument than the one discussed

18   above, regarding whether Defendants adequately marshaled market power by means of a

19   conspiracy.  Whether correctly or not, the complaint alleges market power among the various

20   Defendants, by alleging Guitar Center has market power, and the manufacturers are among

21   the leading manufacturers of instruments and amplifiers.

22   Finally, the manufacturer Defendants point out that because the complaint fails to

23   state a claim for antitrust violations, it also fails under California's and Massachusetts'

24   consumer protection laws because the antitrust violation is the sole claim.

25   **F.    NAMM's Arguments**

26   NAMM argues that because the complaint concedes opponents of the MAPPs were

27   invited to participate on discussion panels, the allegations don't show it was plausibly

28   conspiring.   This argument refers to the news reports about what was said at panel

1    discussions at NAMM's trade shows.  The Court agrees that remarks at open panel

2    discussions attended by many people at trade shows cannot reasonably constitute the terms

3    of an illegal agreement in these circumstances.  Attendance at trade shows isn't in itself

4    suspicious, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp.2d at 1023, and

5    standing alone would only support an allegation that Defendants had an opportunity to

6    conspire.

7        But the complaint can't reasonably be construed as alleging the conspiracy was

8    consummated during panel discussions.  It apparently cites the published reports to show

9    what NAMM's members were openly urging other members to do, as a way of showing it

10   was plausible the Defendants were motivated to do this.  While the claims against NAMM

11   are subject to the same infirmities as claims against other Defendants, they are not weaker

12   or less plausible merely because they mention remarks at panel discussions.

13   **III.    Conclusion and Order**

14       While the consolidated complaint must be dismissed, Plaintiffs may be able to amend

15   successfully.  It is clear, however, that Plaintiffs lack the information to be able to plead with

16   the degree of specificity necessary to give Defendants adequate notice of the claims against

17   them, and the basis for those claims.  Defendants haven't put forward convincing arguments

18   showing Defendants couldn't state a claim if given the opportunity.  Nor is there anything in

19   the complaint to show that whatever Defendants may have been doing was necessarily

20   protected or lawful.

21       Plaintiffs should first narrow the market and products involved, identifying specific

22   types of instruments and products, rather than a generalized conspiracy involving all fretted

23   instruments. Within **21 calendar days from the date this order is entered in the docket**,

24   they must file an amended complaint including the more specific allegations regarding

25   musical instruments (or other products) and markets.  Any Defendants who do not sell within

26   the alleged markets, or who do not sell the specific instruments alleged, should be omitted.

27   Plaintiffs may also make other amendments they believe will cure defects identified in this

28   / / /

1   order.  Defendants are excused from answering or otherwise responding to the amended

2   complaint, until 21 days from the date limited discovery closes.

3       After that, the parties should jointly contact the chambers of Magistrate Judge Louisa

4   Porter, who will preside over limited discovery.  Discovery should be limited to who attended

5   or participated in meetings alleged in the amended consolidated complaint and what was

6   said or agreed to there.  The meetings at issue, by nature, would all be private meetings at

7   trade shows, not speeches or other open events, but they need not have been formal,

8   structured, or scheduled.  If additional meetings are uncovered during the limited discovery

9   phase, Judge Porter may in her discretion extend discovery to those meetings as well.

10  Limited discovery is to be completed no later than **December 1, 2011.**  Judge Porter may

11  in her discretion extend the discovery period by written order, to no later than **February 1,**

12  **2012.**  Any further extensions require approval from Judge Burns, and applications for such

13  extensions must show good cause.

14      If, after the limited discovery period closes, Plaintiffs believe they can successfully

15  amend their complaint, they may do so no later than 21 days from the date limited discovery

16  closes.  The time in which to file an amended complaint will be extended only a showing of

17  good cause.  If they do not amend within the time permitted, the complaint will be dismissed

18  without leave to amend.

19

20      **IT IS SO ORDERED.**

21

22  DATED:  August 19, 2011

23

24      **HONORABLE LARRY ALAN Burns**
    United States District Judge

25

26

27

28

09CV2002